Filed 5/12/14  In re Matthew R. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| In re MATTHEW R., A Person Coming Under the Juvenile Court Law. | B250405 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MARTIN R.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK97989) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Affirmed.

Grace Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant Martin R. (Father) appeals from the juvenile court's orders at a jurisdiction and disposition hearing, declaring his then 13-year-old son, Matthew R., a dependent of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (b). Father's sole argument on appeal is that the evidence was insufficient to support the jurisdictional finding that the parents' actions in allowing numerous firearms and narcotics inside the family home within Matthew's access created a detrimental and endangering situation that placed the child at a substantial risk of harm. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Initiation of the Dependency Proceedings

Father and Lisa R. (Mother) are the married parents of Matthew (born March 1999).[2] Matthew resided with his parents, maternal great grandfather, and maternal uncle, Eric C., in a four-bedroom home. Matthew and Eric shared one of the bedrooms, which had direct access to an attached garage. The family came to the attention of the Department of Children and Family Services (DCFS) in February 2013 following a report of illegal weapons and drugs inside the home.

On February 21, 2013, the Los Angeles Sheriff Department's Bureau of Parole Compliance Team conducted a compliance check on Eric, who was on probation for a drug-related offense and had been residing in the family's home for a few months. During a search of the home, law enforcement officers recovered a total of 12 firearms from the parents' master bedroom, including six assault rifles, four shotguns, and two pistols. The firearms were found in different areas of the bedroom, including under the bed, inside the closet, and beside a dresser in plain view. All of the firearms appeared to be in good working condition, and two of them were loaded, including a Mini-14 rifle that was next to the dresser. Two boxes of ammunition were found on the closet floor.

---

[1]    Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2]    Mother is not a party to this appeal.

In the bedroom that Matthew shared with Eric, officers recovered a police scanner hanging on a wall and an unlocked safe containing $2,815 in cash consistent with street-level drug sales. In the garage that was accessible from Matthew's bedroom, officers found another unlocked safe that included two digital scales, a false identification card with Eric's photograph, 12 plastic baggies containing a substance resembling methamphetamine, two plastic baggies containing a substance resembling heroin, and numerous unused baggies. Eric admitted to the officers that he was a gang member and that all of the weapons and drugs found in the home belonged to him.

Upon receiving a referral from the Sheriff's Department, the DCFS immediately responded to the home and interviewed both parents. Mother denied any knowledge of the weapons or drugs inside the home. She reported that she generally slept in the office and rarely went into the master bedroom. She did go into Matthew's bedroom to clean his side of the room, but she did not go near Eric's side or notice if he had any drugs or drug paraphernalia. Mother was aware that Eric was on probation, but stated that she did not know the nature of the charges against him. She admitted that she had a prescription for medical marijuana to treat endometriosis and back pain, but denied that anyone else in the home used drugs or that drugs were ever sold out of the home. Mother related that she now realized that Eric had been lying to her and that she would not allow him to reside in her home again. Father admitted that Eric had asked his permission to store guns inside the home until he could get rid of them, and that Father had allowed Eric to place the guns in the master bedroom. He denied any knowledge of the drugs found in the garage. Father also stated that if Matthew had found any drugs or guns in the home, he would know not to touch them and to inform his parents.

The DCFS also spoke with Eric while he was being detained outside the home by law enforcement officers. Eric reported that he was on probation for possession of methamphetamine and that he had been residing in the family's home for about three months. He confirmed that the guns, drugs, and cash found inside the home belonged to him, and that Father had allowed him to store the guns in the master bedroom because he

3

did not want them near Matthew.  Eric initially denied any drug use, but then admitted that he had smoked methamphetamine a few days earlier.

Later that day, the DCFS interviewed Matthew at his middle school.  The child was dressed appropriately and appeared to be healthy with no signs of abuse or neglect. Matthew confirmed that he shared a bedroom with Eric, but related that Eric was rarely around when Matthew was at home.  Matthew was unaware of the presence of any drugs or weapons inside the home, and stated that he felt safe in the home and with his family. He also reported that he received good grades in school and that he was active in school and traveling sports activities.  Matthew's principal confirmed that the child was a very good student academically and was an active participant in the school's sports programs. The principal had no concerns about the child's welfare or safety.

Eric was arrested and charged with various crimes, including possession of methamphetamine and heroin for sale, possession of firearms and ammunition by a convicted felon, and receipt of stolen property.  Father was arrested and charged with possession of assault weapons.  Based on its initial interviews with the family, the DCFS decided that Matthew should be removed from Father's care, but allowed to remain in the home under Mother's care as long as she cooperated with the agency.

On February 26, 2013, the DCFS filed a dependency petition on behalf of Matthew under section 300, subdivision (b), which alleged that both Father and Mother had placed Matthew in a detrimental and endangering situation by allowing illegal drugs and firearms inside their home within access of the child.  At the detention hearing, the juvenile court ordered that Matthew be detained from Father and released to Mother.  The court also ordered monitored visitation for Father and family maintenance services for Mother.  The matter was set for a jurisdiction hearing.

## II.     Jurisdiction/Disposition Report

For its April 2, 2013 jurisdiction/disposition report, the DCFS conducted follow-up interviews with the family.  Matthew maintained that he was unaware of any weapons or drugs inside the home.  Mother told the DCFS that she believed Father kept three BB

guns in the master bedroom, but she never saw any other guns and had no reason to suspect that Eric was hiding guns or drugs in their home. Father admitted that he knew about three of the firearms found under his bed, and that he had told Eric to store them in the master bedroom without ammunition. Father continued to deny knowledge of the drugs found in the garage, but admitted to recreational use of marijuana in the past year. Both Mother and Father reported that they worked during the day and that Eric generally entered and exited the home through the garage, where he kept some of his belongings. They were aware that Eric was on probation, but did not know he had been convicted of a drug offense.

The DCFS noted in its report that Matthew had maintained above average grades in middle school and was actively involved in various youth sports leagues. There were numerous baseball awards for Matthew displayed in the home and his athletic accomplishments had been mentioned in several sports publications. The home was clean and well-furnished, and Matthew had his own bedroom decorated with baseball memorabilia. Father was attending monitored visits with Matthew four to five times per week, and the two were closely bonded. Father had been residing at the paternal aunt's home since his release from jail, and Matthew and his parents each conveyed to the DCFS that they wanted Father to return to the family's home. Both Mother and Father were remorseful about allowing Eric to reside in the home and were willing to participate in parenting education to improve their parenting skills.

The DCFS recommended that the juvenile court sustain the petition as pled under section 300, subdivision (b) because the parents either knew or should have known about the firearms and drugs that were in the home and accessible to Matthew. Based on its assessment that Matthew would not be at imminent risk if Father were to reside in the family's home, the DCFS recommended that Father be allowed to return to the home on the condition that he abide by all court orders in his criminal case, and that the parents be provided with family maintenance services. On April 2, 2013, in accordance with the DCFS's recommendation, the juvenile court released Matthew to both parents pending the jurisdiction hearing and allowed Father to return to the family's home.

### III.    Jurisdiction and Disposition Hearing

At the April 12, 2013 jurisdiction and disposition hearing, the juvenile court admitted into evidence the DCFS's detention report and jurisdiction/disposition report. No other evidence was offered by the parties. Counsel for Mother and counsel for Father both requested that the petition be dismissed because there was a lack of nexus between the DCFS's allegations of past neglect and a current risk of harm to Matthew. Counsel for the DCFS and counsel for Matthew joined in asking that the petition be sustained because the parents' claimed ignorance of the quantity of firearms and drugs found in the home was not credible, and their lack of judgment in allowing these items inside their home within Matthew's access created a dangerous situation for the child.

The juvenile court sustained the following amended count in the petition: "On 02/21/2013, the child, Matthew [R.'s] mother, Lisa [R.] and father Martin [R.], placed the child in a detrimental and endangering situation in that heroin, methamphetamine, syringes, five rifles, four shotguns, two handguns and ammunition were found in the child's home within access to the child. Such a detrimental and endangering situation established for the child by the parents endangers the child's physical health and safety and places the child at risk of physical harm." Turning to disposition, the court declared Matthew a dependent of the court under section 300, subdivision (b) and ordered that he remain in the care and custody of both parents under the court's jurisdiction. Family maintenance services were ordered for both parents, including parenting education and random drug testing. On June 5, 2013, Father filed a notice of appeal from the jurisdiction and disposition orders.[3]

---

[3]    At a six-month status review hearing held on October 11, 2013, the juvenile court terminated its jurisdiction over Matthew, who remained released to the custody of both parents. On this court's own motion, we take judicial notice of the minute order entered by the juvenile court on that date. (Evid. Code §§ 452, subd. (d), 459, subd. (a).)

**DISCUSSION**

On appeal, Father challenges the sufficiency of evidence supporting the juvenile court's jurisdictional finding under section 300, subdivision (b). Father specifically contends that the evidence was insufficient to support a finding that the parents' past conduct in allowing guns and drugs inside the family's home placed Matthew at a substantial risk of serious harm at the time of the jurisdiction hearing. We conclude that there was substantial evidence to support the juvenile court's exercise of jurisdiction.

As a preliminary matter, we note that Father's appeal from the jurisdiction order is arguably now moot in light of the juvenile court's subsequent order terminating its jurisdiction over Matthew. "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.] However, dismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.' [Citations.]" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) An appellate court ordinarily will not dismiss as moot challenges to jurisdictional findings that may adversely affect a parent in the future, if subsequent dependency proceedings are ever initiated, or even contemplated, for the parent's children. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1431-1432.) In this case, any potential adverse consequences to Father are more attenuated given that Matthew remained released to the custody of both parents at the time jurisdiction was terminated. Nevertheless, in an abundance of caution, we will address the merits of Father's claim.

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Substantial evidence is "evidence that is reasonable, credible, and of solid value." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) Under this standard of review, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all

7

conflicts in support of its determination and drawing all reasonable inferences to uphold its ruling. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.) If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence supports a contrary conclusion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

Section 300, subdivision (b) provides, in pertinent part, that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . ." "The three elements for a section 300, subdivision (b) finding are: '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' [Citation.] The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future. . . . [Citations.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1395-1396.) "Although evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] . . . There must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135-136.)[4]

The juvenile court found that Matthew came within the jurisdiction of the court under section 300, subdivision (b) because the parents' neglectful conduct in allowing numerous guns and drugs inside their home in locations accessible to Matthew placed the child at a substantial risk of serious harm. The evidence presented at the jurisdiction hearing established that both Father and Mother knew that Eric was on probation at the

---

[4]     As this court has recognized, however, there may be circumstances where a showing of *prior* serious physical harm or abuse of a child is sufficient to support the exercise of jurisdiction under section 300, subdivisions (a) and (b). (*In re J.K.*, *supra*, 174 Cal.App.4th at pp. 1434-1435.)

time he was living in their home. Although the parents denied knowledge of Eric's prior conviction for methamphetamine possession, they should have taken steps to determine the nature of his conviction and the potential risk he posed to Matthew before allowing him to share a bedroom with their son. Given that Matthew's bedroom had direct access to the garage, the parents also should have taken steps to determine what items Eric was storing in the garage that could be a danger to Matthew. The safe containing numerous bags of heroin and methamphetamine was unlocked and accessible to the child, and the quantity of drugs and drug paraphernalia in the safe was consistent with possession for the purpose of sales. (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1651 [parent's acts in "leaving drug paraphernalia within [child's] reach . . . indicated a gross lack of attention to the child's welfare"]; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 825 [juvenile court "is entitled to infer that [11-year-old child] is subjected to a substantial risk of serious physical harm when he or she is placed in an environment allowing access to drugs, with nothing to prevent him from succumbing to the temptation to ingest them"].)

The evidence also showed that Father was aware of the presence of firearms inside the home and allowed Eric to store multiple guns in the master bedroom while Eric was on probation. Indeed, two of the guns—a Mini-14 rifle and an SKS semi-automatic rifle—were found beside a dresser in plain view, and the Mini-14 had a loaded magazine and a round in the chamber. The other firearms found in the master bedroom included a Khan shotgun, a Smith & Wesson pump-action shotgun, a Savage Arms shotgun, a Marlin .22-caliber rifle, a Marlin .30-caliber rifle, a 12-gauge double barrel shotgun, a sawed-off .30-caliber rifle, a Tommy gun, a Smith & Wesson .44-caliber revolver, and a Beretta nine-millimeter semi-automatic pistol. Miscellaneous ammunition was also found on the closet floor. Although Father told the DCFS that he only knew about three of the firearms, the juvenile court reasonably could find that his statement was not credible given the large number of guns that were recovered and their location in Father's bedroom. The juvenile court also reasonably could find that Father failed to protect Matthew from a substantial risk of serious harm by allowing unsecured firearms and ammunition to be kept in an area of the home that was easily accessible to Matthew.

9

Citing *In re J.N.* (2010) 181 Cal.App.4th 1010, Father argues that a jurisdictional finding under section 300, subdivision (b) may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur. In that case, the juvenile court exercised jurisdiction over three children under section 300, subdivision (b) following an incident where both parents became intoxicated while at a restaurant with the children and the father thereafter drove the family home. Two of the children were injured when the father crashed his car into another automobile and then into a light pole. The appellate court reversed the jurisdictional order, reasoning that the evidence did not support a finding that either parent had an ongoing substance abuse problem or that either parent's parenting skills or general judgment was "so materially deficient that the parent [was] unable 'to adequately supervise or protect' the children." (*Id*. at p. 1026.) While recognizing the "profound seriousness of the parents' endangering conduct on the one occasion in this case," the court concluded that "there was no evidence from which to infer there is a substantial risk such behavior will recur." (*Ibid*.)

Father asserts that his single lapse in judgment in allowing firearms in the family's home did not support a finding that Matthew was at a current risk of harm because there was no reason to believe that such conduct would reoccur. Father notes that, at the time of the jurisdiction hearing, Eric was no longer residing in the home and both Father and Mother were remorseful that they had allowed Eric to live there and were willing to learn from their mistakes. Father also reasons that the DCFS could not have believed that his misjudgment prevented him from providing Matthew with regular care since Father was allowed to return to the home prior to the jurisdictional hearing. However, as our Supreme Court has observed, "[a] dependency adjudication is a preliminary step that allows the juvenile court, within specified limits, to assert supervision over the endangered child's care. But it is merely a first step, and the system includes many subsequent safeguards to ensure that parental rights and authority will be restricted only to the extent necessary for the child's safety and welfare." (*In re Ethan C.* (2012) 54 Cal.4th 610, 617.) Here, there was ample evidence to support a finding that Matthew remained at substantial risk of harm from his parents' neglectful conduct in allowing

him to be exposed to guns and drugs inside the home, and that jurisdiction over the child while in the care and custody of his parents was necessary to protect his safety.

Contrary to Father's characterization, this was not an isolated episode of endangering conduct. Eric had been living with the family and sharing a room with Matthew for three months when the guns and drugs were found. Throughout that time, the parents placed Matthew in a dangerous situation by allowing numerous unsecured firearms to be kept in the home within access of the child, and by failing to ensure that Matthew was not being exposed to Eric's illegal drug activities. Father simply assumed that his 13-year-old son would not touch any guns or drugs if he happened to find them. Under these circumstances, the juvenile court reasonably could find that jurisdiction over Matthew was necessary and appropriate while the parents demonstrated compliance with their court-ordered case plans, including the completion of a parenting education program. The juvenile court's jurisdictional order was supported by substantial evidence.

## DISPOSITION

The juvenile court's jurisdiction order is affirmed.


ZELON, J.


We concur:



PERLUSS, P. J.



WOODS, J.

11